Argued and submitted September 14, 2010, decision of Court of Appeals affirmed in part and reversed in part; judgment of circuit court reversed, and case remanded to circuit court with instructions to enter a judgment of acquittal January 6, 2011

STATE OF OREGON,
*Petitioner on Review /*
*Cross-Respondent on Review,*

*v.*

GREGG BRYANT RITCHIE,
*Respondent on Review /*
*Cross-Petitioner on Review.*

(CC CR0401509; CA A129591;
SC S057701 (Control), S057705)

(Consolidated)

248 P3d 405

Ryan Kahn, Assistant Attorney General, Salem, argued the cause and filed the briefs for petitioner on review/cross-respondent on review. With him on the briefs were John R. Kroger, Attorney General, David B. Thompson, Interim Solicitor General, and Erika L. Hadlock, Senior Assistant Attorney General.

Kendra M. Matthews, Ransom Blackman LLP, Portland, argued the cause and filed the briefs for respondent on review/cross-petitioner on review. With her on the briefs was Marc D. Blackman.

Before De Muniz, C. J., and Durham, Balmer, Kistler, Walters, and Linder, JJ., and Gillette, J. pro tempore.[**]

GILLETTE, J. pro tempore

De Muniz, C. J., concurred and filed an opinion.

Kistler, J., dissented and filed an opinion, in which Linder, J., joined.

---

[**] Landau, J., did not participate in the consideration or decision of this case.

**GILLETTE, J. pro tempore**

This case is a companion to *State v. Barger*, 349 Or 553, 247 P3d 309 (2011). Like the defendant in *Barger*, defendant was convicted of multiple (in defendant's case, 20) counts of Encouraging Child Abuse in the Second Degree, ORS 163.686, based on the presence of sexually explicit digital images of children on the hard drives of his computers. Defendant appealed, arguing, among other things, that the state had failed to prove that he "possesse[d] or control[led]" any of the images within the meaning of the Encouraging Child Abuse statute,[1] and that it also had failed to prove venue with respect to some of the charges. The Court of Appeals rejected defendant's argument with respect to the "possess[ion] or control[ ]" element of the charges, but agreed that the state had failed to prove venue with respect to 10 of the counts—Counts 11 through 20. The court therefore reversed defendant's convictions on Counts 11 through 20 and otherwise affirmed. *State v. Ritchie*, 228 Or App 412, 423, 208 P3d 981 (2009). Defendant and the state both petitioned for review by this court and we allowed both petitions. On review, we hold that, in view of the disposition that we make today, we need not—and do not—decide whether the evidence presented by the state was sufficient to allow a rational trier of fact to conclude that the conduct at issue occurred in the county where defendant was tried. Rather, we hold that the evidence presented by the state was insufficient to allow a rational trier of fact to conclude that defendant "possesse[d] or control[led]" any of the images at issue (including those associated with the counts for which venue was an issue), within the meaning of the relevant section of ORS 163.686.[2]

---

[1] The relevant part of ORS 163.686 provides:

"(1) A person commits the crime of encouraging child sexual abuse in the second degree if the person:

"(a)(A)(i) Knowingly possesses or controls any photograph, motion picture, videotape or other visual recording of sexually explicit conduct involving a child for the purpose of arousing or satisfying the sexual desires of the person or another person; [and]

"* * * * *

"(B) Knows or is aware of and consciously disregards the fact that creation of the visual recording of sexually explicit conduct involved child abuse[.]"

[2] Defendant also raises several constitutional challenges to his convictions: He argues that, on its face, ORS 163.686 violates Article I, section 8, of the Oregon

In September 2004, while defendant was working as a music teacher in an elementary school in Clackamas County, officers from the Clackamas County Sheriff's Department went to the school to interview him about a report involving a former student. In the course of the interview, defendant consented to a forensic examination of both his laptop computer, which he had with him at the school, and his desktop computer, which he kept in his home. Defendant turned over his laptop to the officers on the spot and gave the officers permission to enter his home and take the desktop computer.[3]

A police computer specialist, White, examined the desktop computer and discovered 600 pornographic images, most of which were of children, in unallocated space[4] on the computer's hard drive. White repeated the procedure with the laptop and found about 500 pornographic images, again primarily of children, in unallocated space in that computer's hard drive. Virtually all of the images that White discovered were accessible only by means of special data recovery software that forensics experts like White used, but that was not commonly used by ordinary computer users.

The state subsequently charged defendant in Clackamas County Circuit Court with 20 counts of Encouraging Child Sexual Abuse in the Second Degree by "possess[ing] and control[ling] a photograph of sexually explicit conduct involving a child." Counts 1 through 10 were based on 10 sexually explicit digital images of young boys that had been recovered from unallocated space on the desktop computer's hard drive, and Counts 11 through 20 were based on 10 similar digital images that had been recovered from unallocated space on the laptop's hard drive.

___

Constitution and that the Ex Post Facto Clauses of the Oregon and United States constitutions preclude prosecutions under ORS 163.686 when the digital images of child sexual abuse that are involved depict abuse that occurred before the effective date of the statute. In light of our disposition of this case, we need not address those issues.

[3] As the case comes to this court, there is no issue concerning either the validity of defendant's consent or the lawfulness of the subsequent examination of the two computers by the police.

[4] The meaning of the term "unallocated space" is described below, 349 Or at 577.

Defendant waived his right to a jury trial and the case was tried to the court. The state's primary witness was White. White described his examination of defendant's laptop and desktop computers and his discovery of the images that formed the basis of the charges in "unallocated space" in the computers' hard drives. He explained that "unallocated" space "is basically clusters on the hard drive that may or may not have information written to them. If there's information written there, it is * * * a file that was deleted." White then described the process by which deleted files are retained in unallocated space—that, when a "file"[5] is created, the operating system "allocates" the file to a certain location in the hard drive, that a master file table keeps track of that location, and that, when a file is deleted, the data in the file remains in the physical location that originally was allocated, but the master file table is altered to indicate that that location now is "unallocated," *i.e.*, available to be overwritten by new files. Finally, White explained that, although files in unallocated space generally are not available to a user through ordinary means, they can be recovered with special forensic software like the software that he had used.

White then went on to describe some of the characteristics of the images that he had discovered on the two hard drives, and how he was able to tell that certain of the images had been sent to defendant's computer by another user while others may have come to the computer from ordinary Internet sites. At some point, the parties announced that they would stipulate that four of the images—those associated with Counts 1, 2, 3, and 4—had been sent to defendant's desktop computer in a "zipped folder"[6] through an Internet chat room

---

[5] White's testimony was in terms of "files," and we therefore report it that way. But the testimony was, in a sense, abstract: The state's theory of the case was (and has continued throughout to be) that defendant "possessed or controlled" the 20 digital images in question *by displaying them on his computer screen*, not by having one or more "files" of the images in his computers. A case in which the state asserted that defendant illegally possessed or controlled forbidden digital images by having files of them on his computer that he could potentially access would raise different interpretive problems under ORS 163.686 than those that we address today.

[6] A "zipped" file or folder is one that contains data that has been compressed using a mathematical algorithm. The "zipping" process renders the material in the file unreadable until the file is "unzipped" by the recipient. The value of a zipped file or folder is that it can be transmitted from one computer to another more quickly.

by another chat room user, "rasputinlives978," and that, when the folder reached defendant's desktop computer, the folder was unzipped in some manner, so that the images within were available for viewing. The parties were not willing to stipulate as to whether the unzipping was an intentional act by defendant or an automatic function of the chat room program. White could not determine whether anyone had ever used defendant's desktop computer to view the images in that folder. (That was important because, as noted elsewhere, the state's theory of the case was that defendant had possessed or controlled the digital images in Counts 1 through 4 by displaying them on a computer screen.)

White then testified to some additional matters that were relevant to the parties' "chat room" stipulation. He testified that the folder at issue was sent to defendant's desktop computer at 9:24 p.m. on July 7, 2002, and was deleted by midnight of the same day. He also testified that, to receive a zipped folder offered by another Internet chat room user, a computer user generally must affirmatively *accept* the folder or file. White also produced data collected from defendant's desktop showing that, in September 2002, defendant's laptop had received a file entitled "youngyoungboys.mpg" by instant messaging in an apparent swap for another file entitled "13suckbrother.jpg." Finally, White produced fragments of online "chat" found in unallocated space on defendant's desktop computer, which suggested that defendant had solicited and received child pornography from other chat room users. In one of those fragments, someone using one of defendant's acknowledged screen names appeared to be responding favorably to material that a user had shared with him ("I'm taking off my clothes for this one"). In another fragment, a person using one of defendant's screen names appeared to be inquiring about how to obtain videos ("u have videos?") that had been mentioned.

The parties also announced that they had entered into a stipulation concerning the digital images taken from the desktop computer that corresponded to Counts 5 through 10 and the images taken from the laptop computer that corresponded to Counts 11 through 20. Specifically, they stipulated that all those digital images were the product of "web browsing," *i.e.*, searching the Internet. White also provided

technological background evidence that was relevant to that stipulation. He explained how files accessed through web browsing might end up in unallocated space: that, when a computer user accesses a web page, the browser creates a copy of the page and stores it in a temporary Internet file cache; that the next time the user calls up the same web page, the browser pulls up the copy from the temporary Internet file cache, rather than accessing and downloading the same information from the web page; that files held in the temporary Internet file cache may be deleted from the cache in a number of ways, some of which occur automatically and some of which require intentional action by a computer user; and that files that are deleted from the temporary Internet file cache remain in unallocated space unless and until they are overwritten by a new file.

In his testimony, White acknowledged that there was no way of knowing, with respect to any of the files associated with Counts 5 through 20, whether the files had been deleted from the temporary Internet file cache intentionally or by some automatic process. He suggested, however, that the temporary Internet file cache appeared to have been emptied or cleaned more thoroughly and more often than would have occurred by purely automatic processes.

Because of the limitations of his forensic software, White was not able to provide further detail about when and from what website the images associated with Counts 11 through 20 (which had been found on defendant's laptop) had been accessed. He was able, however, to provide a more detailed analysis of the six image files associated with Counts 5 through 10, which had been discovered in unallocated space on defendant's desktop computer. White testified that, insofar as his forensic software enabled him to see at least some dates, file names, and path histories associated with those images, he could determine that all six of the images came from a "photo album" on a single website, that they initially had appeared on the desktop computer's screen as a series of "thumbnail" images,[7] that they had been

---

[7] "Thumbnail" images are small images that usually are presented in groups. Larger versions of the thumbnails may be obtained by clicking on the thumbnail images.

accessed under one of defendant's user names on December 8, 2002, and that the user had "clicked" on the thumbnail images to enlarge them, but had not printed, saved, or taken other actions concerning them.

After White completed his testimony, defendant moved for a judgment of acquittal on all counts, arguing that there was no evidence that he had knowingly "possessed or controlled" the images at issue within the meaning of ORS 163.686(1)(a)(A)(i). Defendant also moved for a judgment of acquittal on Counts 11 through 20, *i.e.*, the counts associated with images found on defendant's laptop, on the ground that the evidence would not support, beyond a reasonable doubt, a finding that those crimes had been committed in Clackamas County. The trial court denied defendant's motions and, after hearing the remaining evidence, found defendant guilty on all 20 counts.

On defendant's appeal, the Court of Appeals affirmed in part and reversed in part. The court opined that, for purposes of ORS 163.686(1)(a)(A)(i), a person "controls" a visual recording when the person "discovers the presence of that recording on the Internet and causes that recording to appear on a specific computer monitor." 228 Or App at 419. The court concluded that there was sufficient evidence in the record to demonstrate that defendant exercised control in that sense over the images associated with Counts 1 through 10, and affirmed the trial court's findings of guilt with respect to those counts. *Id.* at 419-20. The court then addressed defendant's venue argument, which related to the images discovered on defendant's laptop computer (Counts 11-20). It concluded that the state was required to prove venue beyond a reasonable doubt and that the state's evidence—that defendant's home and work were located in Clackamas County, that he had broadband Internet access in his home, and that he generally was logged on to instant-messaging services when at home—was insufficient to support a finding, beyond a reasonable doubt, that defendant and his laptop were in Clackamas County when he downloaded, viewed, and deleted those images. Accordingly, the court reversed defendant's convictions on Counts 11 through 20. *Id.* at 420-23.

As noted, both the state and defendant petitioned for review, and we allowed both petitions. As it turns out, however, we need not address the Court of Appeals holding respecting venue, and we express no opinion concerning it. We turn directly to questions about defendant's "possess[ion] or control[ ]" of the images in question.

As noted, the Court of Appeals held that defendant "controlled" the visual recordings of child sexual abuse that were discovered on his desktop computer, within the meaning of ORS 163.686(1)(a)(A)(i), by "discover[ing] the presence of [such] recording[s] on the Internet and caus[ing them] to appear on a specific computer monitor." 228 Or App at 419.[8] Defendant contends that, contrary to the Court of Appeals' logic, one cannot "knowingly control" an Internet image in that manner, because the act of "discovering" the image and "causing [it] to appear" are simultaneous. Defendant argues that the Court of Appeals is applying the statutory concept of "possess[ion] or control[ ]" to the mere *viewing* of child pornography on the Internet, and that the legislature did not intend, when it enacted ORS 163.686, to criminalize mere viewing of such images.

The state responds that a rational trier of fact could conclude from the evidence that defendant "possessed or controlled" each of the images associated with the 20 charges. The state argues that, when a person opens a web page and displays images on that page on his or her own computer screen, the person possesses or controls the images that appear on his screen in the course of such browsing in a variety of senses—he *physically* possesses them insofar as he can move the computer screen and control the way the images are displayed; he *constructively* possesses them insofar as he has the latent *ability* to save, forward, or otherwise manipulate them; and he *actually* controls them by bringing them to his computer screen in the first instance. The state argues, in a nearly identical vein that, when a person accepts a zipped folder sent to him or her through a chat room and, by inference, displays the images contained therein on his or her computer, he or she "possesses or controls" the images in the same three senses—by physically controlling the way they

---

[8] The full text of ORS 161.686(1)(a)(A)(i) is set out above, 349 Or at 575 n 1.

are displayed, by having a latent ability to manipulate them, and by accepting and, thus, actually controlling the transfer.[9]

In *Barger*, 349 Or 553, we addressed the same explanations for why a user "possesses or controls" any image accessed in the course of web browsing. In *Barger,* the defendant was charged with "knowingly possess[ing] or control[ling]" eight images of child sexual abuse that were discovered in his computer's temporary Internet file cache. The evidence indicated that the images were the product of the defendant's web browsing, but there was no evidence that he had printed, saved, forwarded, or in any other way done anything beyond accessing the images (and, by inference, looking at them). The case thus posed the following question: "Can a computer user be found to have knowingly 'possess[ed] or control[led]' digital images of child sexual abuse, within the meaning of ORS 163.686(1)(a)(A)(i), based solely on evidence showing that, at some time in the past, he intentionally accessed those digital images using his computer's Internet browser and—by reasonable inference—looked at them?" 349 Or at 558.

This court ultimately answered that question in the negative. We concluded that the theories of possession and control that the state had offered, which are identical to the ones that the state asserts here, were either illogical in and of themselves or inconsistent with what, in our judgment, the legislature intended by the statutory phrase "possesses or controls." *Id.* at 562-66. We particularly derived our conclusions about the intended meaning of the phrase "possesses or controls" from contextual evidence showing that the legis-

---

[9] Before this court, the state observes generally that the crime of Encouraging Child Sexual Abuse under ORS 163.686(1)(a)(A)(i) also can be proved by showing that the defendant understands that files containing sexually explicit images continue to be stored in temporary Internet files or in unallocated space in his or her computer. The state at the same time expressly states that it is not pursuing that "storage" theory on review in this case—in spite of the fact that the trial court alluded to that theory when it denied defendant's motion for a judgment of acquittal. We assume that the state is not pursuing that theory here because there is no evidence in the record to support it: The images that are associated with all of the charges were discovered in unallocated space on defendant's computers and there was no evidence presented that suggested that defendant knew or had reason to believe that the digital images might be retained there (although there *was* evidence that defendant knew or suspected that the digital images might be retained in the temporary Internet file cache).

lature did not intend to criminalize the mere *viewing* of child pornography.[10] We also were persuaded by certain cases—notably *State v. Casey*, 346 Or 54, 203 P3d 202 (2009), *State v. Daniels*, 348 Or 513, 234 P3d 976 (2010), and *State v. Weller*, 263 Or 132, 501 P2d 794 (1972)—that discussed common-law notions of physical and constructive possession and the relevant statutory definition of the term "possess," which incorporates those common-law notions. Because those cases indicate that a person's constructive possession of a thing (*i.e.*, his or her dominion or control over it) cannot be established merely by showing that the person has a practical *ability* to manipulate or direct the item, we concluded that something more than a latent ability to save, e-mail, or otherwise manipulate a digital image that appears on a computer user's screen is required to "possess[ ] or control[ ]" the image within the meaning of ORS 163.686(1)(a)(A)(i). *Barger*, 349 Or at 562-66.

---

[10] The dissent contends that *Barger* is incorrect insofar as it treats the act of accessing and "viewing" digitalized images drawn from the web as similar to an act of viewing art in a museum. The dissent argues, in that regard, that images displayed on a computer screen are portable (because a person who has called up an image from a website can move the image from one place to another by moving his or her computer) and controllable (as, for example, when a person replays a specific part of an online video, or skips over uninteresting parts) in a way that art in a museum is not. That argument is unpersuasive for two reasons: First, it depends on the proposition that a mere unexercised ability to move or otherwise physically manipulate something is sufficient to establish possession or control—a proposition that we rejected in *Barger*. 349 Or at 565. Second, it ignores the fact that our holding in *Barger* was premised on the absence of any evidence that the defendant there had done anything other than call the images up to his computer screen. If there had been evidence that defendant had, for example, gone back and looked at particular scenes in a video, etc., or that he had passed around his computer screen while an image of child pornography was displayed on the screen, we would have faced a different interpretive task.

The dissent also finds significance in the facts that images accessed through web browsing involve an actual transfer of data from a website *to a person's computer* and the automatic saving in a temporary Internet file of a copy of the data *on the person's computer*. The dissent suggests that that fact makes an analogy to ordinary viewing (as of pictures in a museum) inapt, because the image in fact exists, in digital form, in the user's computer. But what the dissent fails to acknowledge is that, from the user's point of view, the experience of viewing images on the web is *not* different from viewing images in a museum: The ordinary computer user speaks of visiting or "going to" websites, and has no sense that web images are "in" the user's own computer until the user affirmatively saves them. The computer user's vision of what is happening when he or she is web browsing is relevant, of course, because the statute criminalizes *"knowing* possession and control" of child pornography.

*Barger* appears to control our disposition of the present case. It rejects the state's central idea—that, to the extent that a digitalized image is displayed on a computer screen and, presumably, is viewed by the computer's user, the computer user "possesses or controls" the image.

That is not to say that the facts in the present case are identical in every way to the facts in *Barger*. For example, in *Barger*, there was no evidence that the defendant had taken any intentional action with respect to the images at issue after they appeared on his computer screen; the only inference that could be drawn from the evidence was that the defendant had at some point viewed the images. In the present case, however, there is evidence indicating that defendant enlarged the two images involved in Counts 8 and 9 after he initially accessed the website where they were displayed, and there also is evidence that might support an inference that defendant attempted to remove all traces of the images from his computer's hard drive. Moreover, while the images in *Barger* all had been obtained through web browsing, it appears that certain of the images in the present case came to defendant's computer from a different source. Those images—which are associated with Counts 1 through 4—apparently were transferred to defendant's desktop computer through an instant messaging service by another user of the messaging service.

But the state chose not to make a separate issue out of those factual differences. In the proceedings below and before this court, it has never suggested that Counts 1 through 4, or Counts 8 and 9, should be analyzed any differently than the other counts. With regard to all 20 counts, the state's position has been no different than its position in *Barger*—that defendant "possess[ed] or control[led]" the image at issue as long as the image appeared on his computer screen, because he could change the location where the image was displayed, because he had the capacity to save, forward, and manipulate it, and because he controlled it, in the first instance, by taking affirmative steps to bring it to his screen.[11] We rejected those arguments in *Barger* and, applying *Barger*, we reject them here as well. We conclude, in

---

[11] In fact, it appears that the state's primary concern in the trial court was with convincing the court that it was possible to infer from other evidence that

short, that the evidence presented at trial, with respect to all 20 counts, was insufficient to support a finding of possession or control under any theory of possession or control that the state has urged in this proceeding.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is reversed, and the case is remanded to the circuit court with instructions to enter a judgment of acquittal.

**DE MUNIZ, C. J.,** concurring.

For the reasons expressed in my concurring opinion in *State v. Barger*, 349 Or 553, 567, 247 P3d 309 (2011), I agree with the majority's conclusion in this case.

**KISTLER, J.,** dissenting.

Today, the majority holds that a person who goes onto the Internet, purposefully searches out pictures of child pornography, and displays those pictures on a computer for as long as he or she wishes does not possess or control the pictures. Not only are the factual and legal premises on which the majority's opinion rests suspect, but the majority's decision fails to recognize that today's iPhone is yesterday's photograph. There is no difference between a person who uses his iPhone to pull an image of child pornography off the Internet and then passes that image, displayed on his iPhone, around for his friends to see and a person who passes a photograph of the same image to his friends. Both persons possess or control the image. The fact that the person has not saved the image to his iPhone does not mean that the person does not possess or control it. The majority errs in holding otherwise.

The relevant facts can be summarized briefly. Defendant taught music to elementary school children. As a result of an investigation involving one of defendant's students, the Clackamas County Sheriff's office analyzed the contents of defendant's laptop and home computers.

---

defendant had *actually opened and viewed* the images associated with Counts 1 through 4, which had been sent to defendant in a zipped folder through an Internet chat room. The state had to persuade the trial court that such an inference was permissible in order to prevail on those counts under the theory of possession and control that it was advancing.

Although defendant volunteered that the officers would find "no porn" on his computers, it turned out that defendant was overly optimistic. The forensic expert who analyzed defendant's computers found approximately 600 pornographic images in the unallocated space on defendant's home computer and approximately 500 pornographic images in the unallocated space on his laptop.[1] Almost all of the 500 pornographic images on defendant's laptop involved children, as did approximately 450 of the 600 pornographic images on defendant's home computer.

The state charged defendant with 20 counts of encouraging child sexual abuse in the second degree, based on 10 of the 500 images of child pornography found on his laptop and on 10 of the 450 images of child pornography found on his home computer. *See* ORS 163.686(1)(a)(A)(i).[2] To prove those charges, the state needed to establish that defendant (1) knowingly (2) possessed or controlled (3) a visual recording of sexually explicit conduct involving a child (4) for the purpose of arousing or satisfying his or someone else's sexual desires and (5) that defendant knew, or was aware of and consciously disregarded the fact, that the creation of the visual recording involved child abuse. *Id.* In this case, there is no dispute that the trial court, sitting as the trier of fact, reasonably could find that each of the 20 images found on defendant's computers was a visual recording of sexually explicit conduct involving children; that defendant knew that fact; that, if he possessed or controlled the images, he did so

---

[1] As this court explained in *State v. Bray*, 342 Or 711, 715 n 3, 160 P3d 983 (2007), a hard drive contains both allocated and unallocated space. Allocated space contains data that has been saved to the hard drive. *Id.* When files are deleted from the allocated space, the deleted files remain on the unallocated space on the computer's hard drive and, depending on whether the computer later writes over that data, can be recovered. *Id.*

[2] ORS 163.686(1) provides, in part:

"A person commits the crime of encouraging child sexual abuse in the second degree if the person:

"(a)(A)(i) Knowingly possesses or controls any photograph, motion picture, videotape or other visual recording of sexually explicit conduct involving a child for the purpose of arousing or satisfying the sexual desires of the person or another person; [and]

"* * * * *

"(B) Knows or is aware of and consciously disregards the fact that creation of the visual recording of sexually explicit conduct involved child abuse[.]"

for the purpose of arousing or satisfying his own sexual desires; and that he knew that the creation of each visual recording involved child abuse. Given the volume and content of the images that the police found on defendant's computers, defendant would be hard pressed to argue otherwise.

The majority concludes, however, that the evidence was not sufficient to permit a reasonable trier of fact to find one element of the offense—that defendant "possesse[d] or control[led]" the pictures of child pornography that he had sought out on the Internet. According to the majority, all that the evidence permitted the trial court to find was that defendant "viewed" child pornography, and that, the majority reasons, is no crime. At bottom, the majority's opinion rests on the proposition that going onto the Internet and pulling up pictures of child pornography is no different from visiting a museum and viewing the paintings displayed there. In both situations, the majority reasons, the person views but does not possess or control the pictures.

I have no disagreement with the general proposition that a person does not possess or control every image that he or she sees. Nor do I disagree with the specific example that the majority uses—that a person who goes to a museum and views a painting does not possess or control the painting. The majority errs, however, in assuming that a computer user stands in the same position as a visitor to a museum. This case arises on defendant's motion for a judgment of acquittal, and the question is whether the trier of fact reasonably could have inferred that defendant possessed or controlled the images that he sought out on the Internet and displayed on his computer screen.

On that point, the trier of fact reasonably could have found that, when a person uses a computer to display an image from an Internet website, the data is transferred from the website to the person's computer. The person's computer automatically saves a copy of the data from the website to a temporary Internet file on the computer, and the computer displays on the computer screen a graphic image of that data (whether text or a picture). Put in lay terms, the person's computer copies the data from the website and uses that data to re-create on the person's computer screen the image

that exists (or existed) separately as data on the website's server.[3]

A computer user is not passively viewing a picture as a museum patron does, or so the trier of fact could find.[4] Rather, a computer user is free to search out and select the images that he or she wishes to display on the computer screen. The computer copies the data from the website and, using that copied data, recreates the image from the website on the user's screen, giving a computer user the ability to keep that image on the screen as long as he or she wishes. And, when the computer displaying the image is portable, as an iPhone, iPad, or Droid is, then the user can take that displayed image with him or her, move the image from one place to another, and show it to others in different locations, all without ever saving the image to the user's hard drive.[5]

In the same vein, if a computer user watches a child pornography video on the Internet, as one would watch a video on YouTube, the computer user can start the video, stop

---

[3] The state's expert did not explain whether, when a computer user first accesses the Internet, the image displayed on the screen reflects data stored in the computer's temporary memory or whether the image reflects the data saved to a temporary Internet file on the computer's hard drive. For the purposes of this case, the difference is irrelevant. In both circumstances, the image displayed on the computer screen exists as a result of data maintained in the computer separately from the data available on the Internet.

[4] Possession involves the question of a person's relation to an object, which ordinarily is determined both by legal definitions of property and societal conventions. *See State v. Casey*, 346 Or 54, 61, 203 P3d 202 (2009) (considering the usual relationship between a homeowner and a guest in determining whether the homeowner constructively possessed property that the guest temporarily left in the house). In a museum, not only does the museum have exclusive possession of the objects displayed there, but a visitor to a museum typically is governed by a set of rules that strictly limit the visitor's ability to do anything other than passively view the objects on display. Put differently, the analogy on which the majority's opinion rests is not an apt one.

[5] The portability of an iPhone, iPad, or Droid simply illustrates the control that a computer user possesses over an Internet image displayed on a computer screen. The control arises from the fact, which the trier of fact could have inferred from this record, that the data generating the image is copied to and resides independently in the user's computer. Maintaining an image on the screen, as in the example, does not evidence a greater degree of control than exists when a person calls the image to the screen in the first place. In both situations, the image remains on the screen until the person chooses to navigate away from the web page.

it, go back and look at a particularly interesting scene a second time, move forward through some activity that does not interest the user, or replay the video completely. It is difficult to see how the majority could say that the user does not "control" an Internet video, even though the data that allows the user to manipulate the video is maintained on the user's computer in the same way as the data that gave rise to the pictures that defendant viewed in this case. Nor is it any answer to say that this case involves Internet photographs, not Internet videos. There is no difference in principle between an Internet video and Internet photographs. Control exists in both instances. It is simply more evident with a video.

Admittedly, the images from the Internet that are displayed on a computer screen (whether a photograph or a video) are not permanent, but we have never suggested that permanence is necessary to establish either possession or control. *See State v. Fries*, 344 Or 541, 546-47, 185 P3d 453 (2008) (observing that only momentary or fleeting contacts may be insufficient as a matter of law to establish control); *cf. State v. Hall*, 269 Or 63, 65-66, 68, 523 P2d 556 (1974) (a person who temporarily sat on a bag of marijuana when the police entered a room possessed the marijuana). It also may be true that a computer user does not have exclusive possession or control over images (whether photographs or movies) taken from the Internet. But, again, the court has never held that possession or control must be exclusive; rather, it has recognized that two persons may possess property jointly. *See State v. Downing*, 185 Or 689, 698, 205 P2d 141 (1949) (jury reasonably could infer that the defendant and his accomplice jointly possessed a stolen watch). And the fact that one person who jointly possesses property has the power to dispose of the property completely (as when a person with joint possession of a bank account spends all the money) does not mean that both persons did not have joint possession of the property while it existed.

Ultimately, the majority appears to acknowledge that analogizing a computer user to a museum visitor may not be completely accurate. It appears to recognize that, once a person accesses an image on the Internet, "the image in fact exists, in digital form, in the user's computer." 349 Or at 583 n 10. The majority reasons, however, that

"from the user's point of view, the experience of viewing images on the web is *not* different from viewing images in a museum: The ordinary computer user speaks of visiting or 'going to' websites, and has no sense that web images are 'in' the user's own computer until the user affirmatively saves them."

*Id.* (emphasis in original).

The majority's reasoning fails to distinguish two related but separate issues. It is certainly true that, on this record, no reasonable trier of fact could find that defendant knew why, as a technical matter, he was able to control the images of child pornography that he drew from the Internet and displayed on his computer screen.[6] But there was ample evidence from which a reasonable trier of fact could find that defendant could and did control those images. More specifically, there was evidence from which a reasonable trier of fact could find that defendant had downloaded and played child pornography videos, that he had exchanged photographs of child pornography with others, that he had enlarged pornographic "thumbnail" images so that he could study the pictures depicted in the thumbnails more closely, and that he had maintained images of child pornography on his computer screen, at least long enough "for the purpose of arousing or satisfying [his own] sexual desires." *See* ORS 163.686(1)(a)(A)(i) (stating one element of the offense).

Even if, as the majority reasons, the evidence was insufficient to permit the trier of fact to find that defendant knew *why* he could control the images he accessed, it was more than sufficient for a reasonable trier of fact to find that defendant could and did exercise control over those images. The level of control over the Internet images that defendant displayed on his computer screen made his relationship to those images markedly different from that of a person who goes, say, to the Brancacci Chapel so that he can view (from a distance) Masaccio's frescos. Put differently, the factual

---

[6] As the majority notes, the record is not sufficient to permit a reasonable trier of fact to find that defendant knew that his computer saved every web page that he visited to a temporary Internet file and maintained those saved files in the allocated space on his computer until those files were either manually or automatically deleted. But that proposition matters only if possession or control is limited to saved files.

premise on which the majority's opinion rests—that defendant's relationship to the images on his computer was the same as that of a museum patron to the paintings displayed there—is not the only inference that the trier of fact reasonably could have drawn.

Beyond that, the legal premise underlying the majority's opinion is suspect. In analyzing what the statutory phrase "possesses or controls" means, the majority reasons that an alternative way of proving the crime of second-degree encouraging child sexual abuse demonstrates that a person who searches the Internet for child pornography and displays those images on his or her computer screen does not "posses[s] or contro[l]" the images. Specifically, the majority notes that a person may commit the crime of second-degree encouraging child sexual abuse in one of two ways. ORS 163.686 makes it a crime if, with the requisite mental state, a person either (1) "possesses or controls" a visual recording of child pornography or (2) "pays, exchanges or gives anything of value to obtain or view" a visual recording of child pornography. ORS 163.686(1)(a)(A)(i) and (ii).

Given those alternative ways of committing second-degree encouraging child sexual abuse, the majority reasons:

> "Whatever 'knowingly possess[ing] or control[ling]' recordings of child sexual abuse might mean in subparagraph (1)(a)(A)(i), it involves something different than simply 'obtain[ing]' or 'view[ing]' digital images: The legislature clearly has chosen to criminalize the act of 'view[ing]' or 'obtain[ing]' visual recordings of sexually explicit conduct involving children under ORS 163.686(1)(a)(A)(ii) *only if that act is accompanied by the payment, exchange, or giving of something 'of value,'* an element that is not required under ORS 163.686(1)(a)(A)(i)."

*State v. Barger*, 349 Or 553, 561, 247 P3d 309 (2011) (emphasis and brackets in original).

Later in *Barger*, the majority recognizes that other jurisdictions have held that a person who searches the Internet for child pornography and displays those images on his or her computer possesses or controls those images. *Id.* at 567 n 13; *see, e.g., People v. Josephitis*, 914 NE2d 607, 616-17 (Ill App Ct 2009) (so holding); *Commonwealth v. Diodoro*, 970 A2d

1100, 1108 (Pa 2009) (same); *United States v. Kain*, 589 F3d 945, 950 (8th Cir 2009) (same). The majority, however, reasons that those decisions have no persuasive value in interpreting the phrase "possesses or controls," as used in ORS 163.686, because Oregon's statutory scheme is different. *Barger*, 349 Or at 567 n 13. Returning to the contextual point it made earlier, the majority reasons that our statutes except "viewing" child pornography from the prohibition against possessing or controlling it, rendering Oregon's prohibition narrower than superficially identical prohibitions found in other jurisdictions. *Id.* (explaining that "none of the cases [from other jurisdictions] involves statutes that effectively announce that 'viewing' child pornography is not, by itself, unlawful").

The majority misperceives the statutory context that informs its understanding of the phrase "possesses or controls." Subparagraph (ii) of ORS 163.686(1)(a)(A) provides that a person commits the crime of encouraging child sexual abuse in the second degree if the person "[k]nowingly pays, exchanges or gives anything of value to obtain or view * * * [a] visual recording of sexually explicit conduct involving a child * * *." Textually, the act that the statute prohibits is "pay[ing], exchang[ing] or giv[ing] anything of value" for a particular purpose. The crime is complete when a person pays to obtain or view child pornography, without regard to whether the person in fact ever obtains or views it. It is the payment, not the receipt of the bargained-for consideration, that subparagraph (ii) prohibits. *Cf.* ORS 167.007 (similarly providing that a person who pays to engage in sexual conduct commits the crime of prostitution without regard to whether that person ever gets the benefit of the bargain).

The fact that a would-be purchaser never obtains or views child pornography is immaterial to proving a violation of subparagraph (ii) of ORS 163.686(1)(a)(A). For that reason, the context on which the majority relies is equally immaterial to determining what the phrase "possesses or controls" means in subparagraph (i) of that statute. Were there any doubt about the matter, the majority's conclusion reveals the difficulty with its interpretation. As noted, relying on the alternative method of proving second-degree encouraging child sexual abuse, the majority distinguishes cases from

other jurisdictions (holding that behavior like defendant's constitutes possession or control) by explaining that "none of th[os]e cases involve[d] statutes that effectively announce that 'viewing' child pornography is not, by itself, unlawful." *Barger*, 349 Or at 567 n 13.

Subparagraph (ii), of course, makes it a crime to pay "to *obtain* or view" visual recordings of child pornography. ORS 163.686(1)(a)(A)(ii) (emphasis added). If the majority's statutory interpretation were correct, then our statutes also would "effectively announce that ['obtaining'] child pornography is not, by itself, unlawful." However, "obtain" means "to gain or attain possession or disposal of usu. by some planned action or method." *Webster's Third New Int'l Dictionary* 1559 (unabridged ed 2002). Under the majority's reasoning, obtaining—*i.e.*, possessing—child pornography "is not, by itself, unlawful." Not only is that conclusion antithetical to the rest of the statute, but it also demonstrates that the majority misreads the statutory context, from which it "particularly derive[s]" its understanding of the phrase "possesses or controls." *See* 349 Or at 582-83 (so stating).

Properly interpreted, the prohibition against second-degree encouraging child sexual abuse is directed at two separate acts: (1) possessing or controlling visual recordings of child pornography and (2) paying, exchanging, or giving anything of value in order to obtain or view visual recordings of child pornography. The legislature intended to cast a broad net in prohibiting the abuse of children resulting from the creation and dissemination of child pornography. The majority errs in reading the legislature's effort to reach a broader range of conduct (paying to obtain or view child pornography) as a way of narrowing a related but separate type of conduct (possessing or controlling child pornography) that the statute also prohibits. In sum, I disagree with both the factual and legal premises on which the majority's holding rests. I would hold that the trial court and the Court of Appeals correctly interpreted the statutory prohibition against possessing or controlling child pornography.

The remaining question is whether a reasonable trier of fact could find that defendant possessed or controlled 10 of the approximately 450 images of child pornography

recovered from his home computer and 10 of the approximately 500 images of child pornography recovered from his laptop. The 10 images from defendant's home computer divide into three types: (1) four images received in a zip file; (2) four thumbnail images; and (3) two thumbnail images that defendant selected and enlarged.

Regarding the four zip file images, the trial court reasonably could find that another person sent defendant a zip file containing images of child pornography, that defendant received the file on his home computer, that he was aware that the zip file contained child pornography, and that he accepted the zip file. Given that evidence, I would hold that, in accepting the zip file, defendant exercised possession or control of both the file and its contents. In that respect, defendant's receipt of the zip file was no different from a person who receives a package in the mail knowing its contents. That evidence was sufficient for a reasonable trier of fact to find that defendant possessed both the file and its contents.[7]

The four images contained on a thumbnail page present a more difficult issue, but not because of any question whether defendant possessed or controlled those images. Typically, a thumbnail page displays several rows of small pictures or thumbnails. The page functions much like a menu in a restaurant. It displays a series of offerings, only some of which a user may wish to select. If a user wants to see a larger image of a particular thumbnail, he or she can click on the thumbnail and cause a larger image to appear on the computer screen. For the reasons discussed above, I would hold that, when a computer user displays a thumbnail page on the computer, he or she possesses or controls all the images or thumbnails on the page.

To be sure, there may be factual questions regarding the computer user's state of mind: A user may not act knowingly regarding every thumbnail that appears on a web page.

---

[7] To be sure, the state's expert was not able to say whether defendant purposefully opened the zip file or whether defendant's software did so automatically. The state's expert was also not able to say whether, assuming that the file contained 70 images of child pornography, defendant would have in fact looked at all of them. But both those factual issues are immaterial to whether defendant possessed or controlled the file once he received it.

And, if a user does not select and enlarge a particular thumbnail, then it may be that the user did not possess or control that thumbnail "for the purpose of arousing or satisfying the [user's or someone else's] sexual desires * * *[.]" *See* ORS 163.686(1)(a)(A)(i) (requiring proof of that state of mind). But those are questions for the trier of fact regarding defendant's state of mind. They have no bearing on whether a reasonable trier of fact could find that defendant "possesse[d] or control[led]" the thumbnail images that he displayed on the computer screen. As to that issue, I would hold that the evidence was sufficient to go to the trier of fact.

Regarding the remaining two images from defendant's home computer, the evidence would permit a reasonable trier of fact to find that defendant selected two of the thumbnails so that he could see a larger image. For the reasons explained above, I would hold that defendant's ability to manipulate and maintain those images on his computer screen constituted "control" within the meaning of ORS 163.686. *Cf. State v. Blake*, 348 Or 95, 102, 228 P3d 560 (2010) (explaining that "[t]he ability to manipulate a bank account using a computer is sufficient to constitute 'dominion and control * * *.' ").

The 10 images found on defendant's laptop present two issues. The first is whether a reasonable trier of fact could find that defendant possessed or controlled them. All 10 pictures were images that defendant purposefully retrieved from the Internet, or so a reasonable trier of fact could find, and I would hold for the reasons explained above that defendant possessed or controlled those images. The only remaining issue is whether a reasonable trier of fact could find that the state had established venue in Clackamas County.[8]

On that issue, the evidence at trial showed that defendant bought his laptop computer approximately six to eight months before the officers seized it. During that time,

---

[8] Given the majority's holding that defendant did not possess or control these images, the majority does not reach the question whether the evidence is also insufficient to find venue. Because I would hold that the evidence was sufficient to find possession or control, it is necessary to reach venue.

defendant lived and worked in Clackamas County. Defendant told the officers that he almost always kept his laptop with him and that, after he bought it, he hardly ever used his desktop computer at home. Finally, there is no evidence in this record that defendant ever left Clackamas County between the time that he purchased the laptop and the time that the officers seized it. Having considered that evidence, the Court of Appeals held that it was not sufficient to prove venue. The Court of Appeals reasoned that the fact that defendant lived and worked in Clackamas County was not sufficient to permit a reasonable trier of fact to find beyond a reasonable doubt that defendant used his laptop computer solely in Clackamas County to get access to the Internet. *See State v. Ritchie*, 228 Or App 412, 421-23, 208 P3d 981 (2009).

On review, the state argues that venue is not an element of an offense that the state has to prove beyond a reasonable doubt but that, even if it is, there was sufficient evidence from which the trial court could have found that defendant accessed all 10 images on his laptop while in Clackamas County. There is no need to reach the larger question that the state raises. In my view, the evidence was sufficient for a reasonable trier of fact to find that venue lay in Clackamas County.

Specifically, a reasonable trier of fact could find that, after defendant bought the laptop, he used that computer instead of his home computer; that is, that the laptop took the place of the computer that defendant had used exclusively at his home. A reasonable trier of fact also could find that, given the nature of the subject matter, it was unlikely that defendant would have used his laptop computer to access child pornography outside the privacy of his home or perhaps a motel (or some other private place) if he were travelling. There is, however, no evidence that defendant ever strayed outside of Clackamas County during the six to eight months that he owned the laptop, much less that he went to some secluded place outside of Clackamas County where he could have used his laptop to privately access child pornography. Given that evidence, a reasonable trier of fact could find that defendant accessed the Internet from his home in Clackamas County to search for the 10 images of child pornography that the officers later found on his laptop. *See State v. Cervantes*, 319 Or

121, 125-26, 873 P2d 316 (1994) (inferring from circumstantial evidence that the crime at issue had occurred in Coos County).

Defendant argues, however, that he could have left Clackamas County while he owned the laptop, that he could have taken the laptop with him, that he could have found a private place somewhere outside the county, and that, while outside the county, he could have used his laptop to access child pornography on the Internet. Without any evidence that defendant ever left Clackamas County during the time that he owned the laptop and without any evidence that, even if defendant had left Clackamas County, he went to some secluded place where he could use his laptop to look for child pornography, defendant's argument reduces to nothing more than speculation. But, even if a trier of fact reasonably could have drawn all the inferences that defendant urges, that is not the only reasonable inference that the trier of fact could draw on this record.

Beyond that, ORS 131.325 provides, in part, that, "[i]f an offense is committed within the state and it cannot readily be determined within which county the commission took place, * * * [the] trial may be held in the county in which the defendant resides * * *." Under that statute, even if one assumed that defendant might have gone to Multnomah, Lane, or Malheur County to access child pornography on his laptop, venue still would be appropriate in Clackamas County if it could not readily be determined which county defendant was in when he went on the Internet. Venue in Clackamas County would be defeated only if a trier of fact were willing to speculate that defendant had gone outside the state during the time he owned the laptop and accessed child pornography in some state other than Oregon. Without some evidence that defendant in fact left the state, it is difficult to see how a trier of fact reasonably could draw that inference. But, even if that were a permissible inference, nothing in this record compels it. In my view, the Court of Appeals erred in holding that the state had failed to establish venue in Clackamas County.

I would uphold the trial court's rulings both as to venue and as to possession or control. Accordingly, I would

affirm all defendant's convictions and respectfully dissent from the majority's contrary holding.

Linder, J., joins in this dissenting opinion.